AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
11/08/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ASI   DEPTUTY

FILED
CLERK, U.S. DISTRICT COURT
11/08/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: CGM   DEPUTY

United States of America

v.

RAJ MATHARU,

Defendant(s)

Case No. 2:24-mj-06793-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 6, 2024, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Megan Palmer
*Complainant's signature*

Megan Palmer, HIS Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: November 8, 2024

*Judge's signature*

City and state: Los Angeles, California

The Hon. A. Joel Richlin, U.S. Magistrate Judge
*Printed name and title*

AUSA: Diane Roldán (x6567)

**AFFIDAVIT**

I, Megan Palmer, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Raj MATHARU for violating 21 U.S.C. § 841(a)(1) (possession with intent to distribute methamphetamine) on or about November 6, 2024.

2. This affidavit is also made in support of a warrant to search the following two electronic devices (collectively, "SUBJECT DEVICES"), currently in the custody of Homeland Security Investigations ("HSI") in El Segundo, California, each of which are described more fully in Attachment A: (1) a white iPhone with a teal case ("SUBJECT DEVICE-1"), and (ii) a silver MacBook Air bearing serial number FVFG10R8Q6LW ("SUBJECT DEVICE-2"), both seized from MATHARU.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to possess with the intent to distribute controlled substances), 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of a controlled substance), and 18 U.S.C. § 554 (knowing exportation of any merchandise contrary to any law) (the "SUBJECT OFFENSES"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  In the course of my work, I have conducted physical surveillance, executed arrest warrants, and reviewed electronic records.

6.   Prior to HSI, I received a Master of Science in National Security and a Cybercrime Investigations Graduate Certificate from the University of New Haven.  I also completed a Bachelor of Science in Justice Studies with a concentration in Homeland Security and Terrorism from Southern New Hampshire University.

7.   In October 2024, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Centers in Glynco, Georgia.  During this training program, I completed approximately 500 hours of instruction in the Criminal Investigator Training Program.  I have also completed approximately 500 hours of HSI-related instruction from the Federal Law Enforcement Training Centers, resulting in a certification of completion from the HSI SA Training Program.  This training included classes involving the study of constitutional law, search and seizure, surveillance, contraband investigations, and other program areas for which HSI bears responsibility.

8.   During my employment with HSI, I have participated in investigations that involve drug trafficking.  Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by individuals involved in drug trafficking and how they use digital devices to facilitate and conceal their crimes.

### III. SUMMARY OF PROBABLE CAUSE

9.   On November 6, 2024, MATHARU attempted to travel from Los Angeles International Airport ("LAX") to Sydney, Australia, on United Airlines Flight 839, which was scheduled to depart LAX at approximately 10:40 p.m.  At the United Airlines ticket counter, MATHARU checked two suitcases, one pink hard side

luggage and one grey hard side luggage. He paid a $100 "Second Bag Fee," using his credit card.

10. After MATHARU released the suitcases to United Airlines for his international flight, screening officers X-rayed the suitcases. The X-ray revealed an anomaly and officers pulled the suitcases for a secondary inspection by Customs and Border Protection ("CBP") officers.

11. Upon opening the suitcases, CBP found they were filled with white or light-colored clothing items that were dried stiff and covered in a white residue. CBP then intercepted MATHARU at his gate and asked about his suitcases. MATHARU admitted to owning the suitcases. Officers field tested a sample of the residue, which yielded positive results for methamphetamine. The total weight of the clothing items with the methamphetamine caked into them was approximately 32.41 kilograms.

12. When CBP officers intercepted MATHARU at his gate, he had a backpack in his possession containing several personal effects, including his passport, as well as the SUBJECT DEVICES.

IV. **STATEMENT OF PROBABLE CAUSE**

13. Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, including CBP officers, and my review of reports and records connected to this investigation, I am aware of the following.

4

### A.     MATHARU Checks Suitcases Filled with Suspected Narcotics onto his Flight to Australia

14.  According to United Airlines boarding pass and baggage receipt records, MATHARU arrived at LAX in the evening on November 6, 2024, with a ticket for United Airlines Flight 839, from LAX to Sydney, Australia, scheduled to depart LAX at approximately 10:40 p.m.  At the ticketing counter, MATHARU checked one large pink suitcase and one large grey suitcase onto his United Airlines flight.

15.  I have reviewed a United Airlines boarding pass under the name "Raj Matharu" for United Airlines Flight 839, under the ticket number 01624337787155.  Per airport policy, before checking bags for international flights, United Airlines employees confirm that the individual checking bags at the ticketing counter matches the identity document provided for travel and the individual's boarding pass.

16.  I have also reviewed a United Airlines "Baggage Receipt" for ticket number 0162433778715,[1] which confirms a $100 fee for "Second Bag Fee" for bag number 0164447246444.  The receipt records that the fee was paid using a Visa card ending in 3320.  CBP officers later found a Visa credit card under the name of "Raj Matharu" ending in 3320 in MATHARU's wallet.

---

[1]  The Baggage Receipt ticket number appears to have one fewer digits than the boarding pass for "Raj Matharu," but is otherwise identical.

5

17. After MATHARU checked his two suitcases, the suitcases were screened pursuant to CBP's international flight screening protocols and border search authority, which is designed in part to curb current narcotics smuggling trends from the United States to other countries, including Australia.

18. During the initial X-ray screening, screening officers flagged the suitcases for further inspection due to anomalies the screening officers could see on the X-ray images that indicated the potential presence of contraband. Officers pulled the bag for secondary in-person inspection.

19. The two bags CBP pulled for secondary inspection had baggage tags under MATHARU's name. Photographs of the bags are below:



 

20.  When CBP officers opened the suitcases, they found various clothing items in both suitcases.  The clothing items were dried stiff and appeared to be caked with a white powdery substance.  The officers also noticed a white powder residue that was loose in the suitcases and was visible on the suitcases and clothing items.  Photographs of the clothing items and residue on one of the suitcase are shown below:



7



21.  After discovering this white powder and additional white powdery substance caked into the clothes, CBP officers went to the gate for United Airlines Flight 839.  There, they found MATHARU at the gate boarding area for his flight to Australia.  CBP officers brought him to the CBP inspection area with his personal belongings.

**B.    MATHARU Admits to Owning the Suitcases and Identified Both Suitcases as his Checked Luggage**

22.   While at the inspection area, CBP asked if the two suitcases belonged to MATHARU. MATHARU confirmed that the suitcases were his.

23.   Officers then removed the clothing items from inside the suitcases. In the gray hard-sided suitcase were approximately: 2 towels, 6 pairs of socks, 5 boxers, 7 tank tops, 1 pair of sweatpants, 2 pairs of jeans, 4 hoodies, 1 polo shirt, 2 button-up shirts, and 1 long sleeve top. Each of these clothing items was white or very light-colored, stiffened, and caked with a white residue. Inside the same gray suitcase were also 13 items of clothing in a variety of colors, which were not stiffened and were not caked in residue.

24.   In the pink hard-sided suitcase, CBP officers found 5 white t-shirts, 8 pairs of female underwear, 19 pairs of socks, 2 sports bras, 3 tank tops, 2 towels, 1 cardigan sweater, 1 hoodie, 1 fleece sweater, 1 onesie pajama, and 2 sweaters. Each of these clothing items was white or very light-colored, stiffened, and caked with a white residue. In addition, inside the pink hard-sided suitcase there were other 10 items of clothing in a variety of colors, which were not stiffened and were not caked in residue. Below are pictures of the residue-covered clothing items from both suitcases:





25. The white residue on the clothes field-tested positive for methamphetamine.

26. In my training and experience, I know that methamphetamine can appear as a liquid, in crystalized form ("crystal meth" or "rocks"), or in a white powder form. Most commonly, methamphetamine is smuggled into or out of the United States in powder or liquid form. In this instance, I believe MATHARU was actively trying to conceal the methamphetamine within white clothing. I believe in this instance the white methamphetamine was "washed" into the white clothing and left to

dry. Based on my training and experience, I know that over time in a room temperature or cold environment, the solution would evaporate and then the powdered methamphetamine would separate from the shirt, forming a white residue.

27. CBP officers weighed the methamphetamine residue-covered clothing from both suitcases. The combined total weight of the clothing with the white residue caked into them amounted to approximately 32.41 kilograms.

28. Although the CBP officers were unable to separate the methamphetamine from the clothes themselves while on the scene, I estimate from my own research that the average weight for the clothing items in their standard form (i.e., shirts and sweaters without residue) would likely total approximately 12 to 16 kilograms. If so, the clothing likely contained an estimated 15 to 20 kilograms of methamphetamine solution, causing the total weight of the clothing and residue to be approximately 32.41 kilograms.

    **C.**    **MATHARU Possessed Both SUBJECT DEVICES**

29. When CBP officers met MATHARU at the gate for United Airlines Flight 839, he had in his possession a backpack. After escorting MATHARU to the CBP screening area, CBP officers opened the backpack and found several of MATHARU's personal effects inside. Among the backpack's contents were MATHARU's passport, the credit card he had used to pay the luggage baggage fee, United Airlines tag stubs for the baggages, and both SUBJECT

DEVICES.  MATHARU confirmed that the SUBJECT DEVICES were his. Officers seized the SUBJECT DEVICES, which are currently in HSI's custody.

### D. HSI Arrives and Attempts to Interview MATHARU

30.  After the above events, HSI agents arrived at LAX. Agents first read MATHARU his Miranda rights.  MATHARU invoked his right to counsel and declined to speak further without a lawyer.  At that time, the interview was terminated and HSI agents took MATHARU into custody on the morning of November 7, 2024.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

31.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale

and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e- mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

---

[2] As used herein, the term "digital device" includes SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

      e.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to

search a digital device for many reasons, including the following:

      i.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      ii.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

## VII. CONCLUSION

34. For all of the reasons described above, I submit that there is probable cause to believe that MATHARU committed a violation of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Methamphetamine). I further submit that there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  8th   day of
November, 2024.

_____
HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE

17